IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CEDAR CREST PROFESSIONAL :
PARK VII LP, :
 :
     Plaintiff, :     CIVIL ACTION NO. 17-1571
 :
  v. :
 :
BOSSELLI ITALY LLC, :
 :
     Defendant. :

## MEMORANDUM OPINION

Smith, J.                        October 21, 2019

  The principal of the defendant company in this case was shocked to open his mailbox one day in March 2017 and discover the entry of a confessed judgment against the company in the amount of nearly $19 million, purportedly for breaching a 2014 commercial lease in Pennsylvania. He soon discovered that his longtime friend forged his name on the agreement. He contacted the plaintiff to resolve the matter, but the parties' discussions were unsuccessful, and this litigation moved forward. After a period of discovery and multiple substitutions of defense counsel, this court held a one-day non-jury trial to resolve the matter.

  The plaintiff asserts that the trial demonstrated that the defendant's principal signed the lease agreement, or, alternatively, that his representations to the plaintiff's principal and a real estate broker who participated in the lease negotiations created apparent authority for the defendant's principal's long-time friend to enter agreements binding on the company. The defendant responds that the trial revealed that its principal did not even know about the lease agreement until he received notice of the confessed judgment in 2017, and he did not authorize— or act in a way that suggested he authorized—his friend to act on his or his company's behalf. The court deems the defendant's principal's testimony that he did not know about the lease

agreement to be credible, and further finds that his generalized, limited statements to the real estate broker and the plaintiff's principal about his relationship with his friend would not lead a reasonably prudent person to conclude that this friend had authority to act on his or the company's behalf. Moreover, as neither of the lease contingencies were fulfilled and the plaintiff did not waive the contingencies in writing, as the lease agreement required, the lease was never valid in any event. The court will therefore strike the confessed judgment and enter judgment in favor of the defendant.

## I.    PROCEDURAL HISTORY

The plaintiff, Cedar Crest Professional Park VII LP ("Cedar Crest"), filed a "Complaint for Confession of Judgment for Money" against the defendant, Bosselli Italy LLC ("Bosselli"), in the Court of Common Pleas of Lehigh County, on March 9, 2017.[1] Notice of Removal, Ex. A, Doc. No. 1-1. On the same date, the Prothonotary of Lehigh County entered a confessed judgment in the amount of $18,981,011.70. Notice of Removal, Ex. D, Notice of Filing Judgment.

Bosselli removed the action to this court on diversity grounds on April 6, 2017. Notice of Removal at 1–2, Doc. No. 1. The next day, Bosselli filed a motion to vacate the confessed judgment. Doc. No. 2. Cedar Crest filed a response in opposition to the motion on April 24, 2017. Doc. No. 5. The court held a hearing on the motion the next day, April 25, 2017, Doc. No. 6, following which the court entered an order opening, but not striking, the confessed judgment. Doc. No. 7. The court also set a schedule for Bosselli to answer the complaint, the parties to

---

[1] In the complaint, Cedar Crest alleges that it entered into a lease agreement with Bosselli on June 10, 2014, for Bosselli to rent a building on "a multi-tenant integrated commercial development project known as Cedar Crest Professional Park" in Allentown, Pennsylvania. *See* Compl. at ¶ 3 and Ex. A, Agreement. The complaint sought a confessed judgment in the amount of $18,077,154.00 in damages and an additional $903,857.70 in attorney's fees, for a total of $18,981,011.70. *See id.* at ¶¶ 8, 9.

complete discovery, and the parties to submit dispositive motions and any necessary pretrial filings. *Id*. Per the court's order, Bosselli filed an answer on May 8, 2017. Doc. No. 9.

On May 9, 2017, the court entered an order staying all deadlines due to the parties' representation that they were actively engaged in settlement discussions, Doc. No. 11, but the court lifted the stay and imposed new deadlines on August 7, 2017, when the parties still had not settled. Doc. No. 14. On November 6, 2017, the court granted defense counsel's motion to withdraw after a hearing and gave Bosselli 45 days to retain new counsel. Doc. No. 21. New counsel entered a notice of appearance on behalf of Bosselli on December 18, 2017, Doc. No. 24, following which the court set new discovery and trial deadlines. Doc. No. 28. The court extended those deadlines again on July 10, 2018. Doc. No. 43.

On September 27, 2018, Bosselli's second counsel filed a motion to withdraw, Doc. No. 44, which the court granted after a hearing on October 16, 2018. Doc. No. 48. The court again gave Bosselli 45 days to retain new counsel. *Id*. The court granted new counsel's *pro hac vice* motion on December 10, 2018, Doc. No. 54, following which the court entered another scheduling order, Doc. No. 56, which the court extended again on January 3, 2019, Doc. No. 57, and April 3, 2019. Doc. No. 59. Cedar Crest and Bosselli filed pretrial memoranda and proposed findings of fact and conclusions of law between April 16, 2019 and April 24, 2019. Doc. Nos. 64–67. The court then held a one-day non-jury trial on May 9, 2019. Doc. No. 73. Cedar Crest and Bosselli filed their amended proposed findings of fact and conclusions of law on July 8, 2019 and July 9, 2019, respectively. Doc. Nos. 77, 79. Neither party's filing included specific citations to the record, so the court entered an order on July 23, 2019, requiring them both to file revised submissions. Doc. No. 80. Cedar Crest filed its supplemented proposed findings of fact and conclusions of law on August 5, 2019. Doc. No. 81. Bosselli filed its supplemental trial brief

and proposed findings of fact and conclusions of law on August 6, 2019. Doc. Nos. 82–83. The court heard oral argument from counsel for the parties on October 17, 2019. The matter is now ripe for resolution.

## II.  FINDINGS OF FACT

1.  At some time in 2012, David Schumacher ("Schumacher") suggested that Vincenzo D'Eletto ("D'Eletto"), Bosselli's sole principal and shareholder, lease property in Pennsylvania from David Rothrock ("Rothrock"), Cedar Crest's principal, but D'Eletto declined because he did not have the necessary funding. Tr. of Nonjury Trial, Day 1 ("Tr.") at 157, Doc. No. 75; *see also id.* at 152; Articles of Organization for Bosselli Italy, LLC; Def.'s Ex. 22, Aff. of Vincent D'Eletto at ¶ 2.

2.  Despite D'Eletto representing that he was disinterested in leasing Cedar Crest's property, Schumacher continued to negotiate a lease with Rothrock and a real estate broker, Michael Pascal ("Pascal"), without D'Eletto's knowledge. *See* Tr. at 21, 23, 24, 37, 42, 44, 88, 105–06, 157, 158; *see also* Am. Suppl. Proposed Findings of Fact and Conclusions of Law on Behalf of Pl. Cedar Crest Professional Park VII LP ("Pl.'s Proposed Findings and Conclusions") at p. 1, ¶ 4, Doc. No. 81 ("David Rothrock, managing member of Cedar Crest Professional Park VII LP[,] had numerous discussions with Michael Pascal and David Schumacher regarding a potential lease by Bosselli Italy of commercial space at Cedar Crest Professional Park.").[2]

3.  Schumacher delivered a purportedly executed 2014 lease between Cedar Crest and Bosselli (the "Lease" or the "2014 Lease"), which included D'Eletto's forged signature. Tr. at 55, 58, 161.[3]

---

[2] Because Cedar Crest renumbers its findings of fact and conclusions of law, the court references both the page and paragraph number when citing to this document.
[3] The Lease was dated June 10, 2014, Tr. at 51, but Rothrock could not recall when Schumacher delivered the agreement to his office. *Id.* at 55. Rothrock, Pascal, and Schumacher had previously prepared a 2012 agreement to

4. Rothrock and D'Eletto never spoke or met during the negotiation of the 2014 Lease. *Id.* at 50.

5. D'Eletto did not sign the 2014 Lease.[4] *Id.* at 161.

6. The 2014 Lease involved the same building as the 2012 lease. *Id.* at 51.

7. The 2014 Lease included the following provision:

**LEASE CONTINGENCIES:** The validity of this Lease is contingent upon the following: (i) Tenant providing Landlord with an Irrevocable Standby Letter of Credit, with terms acceptable to Landlord, drawn on a financial institution acceptable to Landlord, in the amount of the total Annual Minimum Rent for the entire initial term of this Lease; or (ii) a bonded lease from a reputable bank or financial institution acceptable to Landlord in Landlord's sole discretion.

Agreement of Lease By and Between Cedar Crest Professional Park VII LP, a Pennsylvania Limited Partnership ("Landlord") and Bosselli Italy LLC, a New York Limited Liability Company, ("Tenant") for Premises Located at: Building 1249, Suite 300, 200 and 100A South Cedar Crest Boulevard, Allentown, Lehigh County, PA ("Agreement of Lease") at § 1(L), Doc. No. 1-1 at ECF p. 11.

8. Neither of these contingencies ever occurred. Tr. at 75, 78.

9. The Lease further stated:

No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof or to exercise any right or remedy upon a breach thereof, and no acceptance of full or partial Annual Minimum Rent, Additional Rent, or other charges or payment during the continuance of any such breach, shall constitute or be implied as a waiver of any such breach or of any such agreement, term, covenant or condition. No agreement, term, covenant or condition hereof to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each and every agreement, term, covenant and condition hereof shall continue in

---

lease the property, which was never fulfilled, but that agreement is not at issue here. *See id.* at 43–44 ("If I indicated to you that the first lease, not the one that we sued on, the first lease for 2012, will that refresh your recollection as to approximately when Bosselli Italy, as a tenant[,] was introduced as a concept to you?"); *id.* at 46 (acknowledging 2012 lease was never consummated).

[4] The court deemed all D'Eletto's testimony to be credible, and Cedar Crest did not present any credible evidence that contradicted his testimony that he did not sign the lease.

full force and effect with respect to any other then existing or subsequent breach thereof.

Agreement of Lease at § 24(G).

10. Cedar Crest never provided a written waiver of any Lease provision. Tr. at 98.

11. In or around October 2014, Schumacher provided Cedar Crest with a security deposit check that he claimed would be drawn on D'Eletto's attorney's escrow account, but the check bounced.[5] *Id*. at 56, 58–59, 66, 121, 122–23.

12. Cedar Crest did not contact D'Eletto about the check bouncing. *Id*. at 60, 80.

13. No one from Bosselli ever moved into or otherwise used the leased space under the 2014 Lease. *Id*. at 66–67.

14. D'Eletto learned of the existence of the 2014 Lease when he received notice of the confessed judgment in the mail. *Id*. at 158.

15. After the 2014 Lease was purportedly executed but prior to receiving the notice of the confessed judgment, D'Eletto had a single "cursory summary call" with Rothrock about a potential unrelated financing deal, in which he acknowledged that Schumacher was working on the deal, but in no way referenced the Lease. *Id*. at 70–71. The parties eventually prepared an August 3, 2015 proposal letter in connection with this deal, which Schumacher signed in his purported capacity as Executive Vice President of Bosselli Italy LLC and Vincenzo D'Eletto Ltd., but there was no evidence that D'Eletto ever saw the August 3, 2015 letter. *Id*. at 71.

16. D'Eletto made general statements to Pascal about being close to and working with Schumacher, but he did not represent in any of those discussions that Schumacher had any authority to bind Bosselli and never referenced a lease of the Cedar Crest property. *Id*. at 111–13.

---

[5] The parties also discussed a separate check Schumacher provided that bounced, but that check did not appear to relate to the Lease. *Id*. at 122 ("The other [check] was [for] a real estate project that . . . Schumacher and I [(Pascal)] . . . were involved in and was to help finance, secure the project, so we can develop it and sell it.").

### III.    DISCUSSION

### A.    Whether the 2014 Lease Ever Came into Being

The parties agree that the contingencies upon whose occurrence the 2014 Lease would become valid never occurred. According to Bosselli, this means there never was a valid lease, and so it cannot possibly owe Cedar Crest any rent, let alone all rent owed for the full lease term. Def.'s Am. Proposed Findings of Fact and Conclusions of Law ("Def.'s Proposed Findings and Conclusions") at ¶¶ 26, 27, Doc. No. 83. Cedar Crest, in contrast, argues that the 2014 Lease allowed Rothrock, as the landlord, to waive any conditions and that he did so with the Lease contingencies. Pl.'s Proposed Findings and Conclusions at p. 10, ¶ 45. The question for the court to answer is whether the Lease required any such waiver to be in writing, which the parties do not dispute never occurred. *Id.*; Def.'s Proposed Findings and Conclusions at ¶ 27. The parties agree that the Lease here is an unambiguous contract. *See* Pl.'s Proposed Findings and Conclusions at p. 17, ¶ 23 ("In the case at bar, the language in the Lease discussing the waiver of strict performance, 24 G, is clear and unambiguous."); Def.'s Proposed Findings and Conclusions at ¶ 25 ("The lease clearly states that the lease would be valid only if the lease contingency clause is satisfied."). "A clear and unambiguous contract provision must be given its plain meaning." *Nationwide Mut. Ins. Co. v. Riley*, 352 F.3d 804, 807 (3d Cir. 2003) (citation omitted). Therefore, the court seeks only to ascertain the plain meaning of the Lease language concerning the waiver of any of its terms.

On direct examination, Rothrock testified to the contingencies necessary for the Lease to take effect. Tr. at 51–52. Specifically, the Lease states,

> **LEASE CONTINGENCIES:** The validity of this Lease is contingent upon the following: (i) Tenant providing Landlord with an Irrevocable Standby Letter of Credit, with terms acceptable to Landlord, drawn on a financial institution acceptable to Landlord, in the amount of the total Annual Minimum Rent for the

entire initial term of this Lease; or (ii) a bonded lease from a reputable bank or financial institution acceptable to Landlord in Landlord's sole discretion.

Agreement of Lease at § 1(L). Rothrock then testified that he had received a 2012 agreement between Bosselli and Phoenix Capital Associates "as exclusive referral agent to refer investors and lenders [and] a negotiation of a private placement for securities by the company," which would have satisfied one of two necessary contingencies in the 2012 lease. Tr. at 52:19–53:7. Strangely, Rothrock did not testify to how this agreement related to the contingencies in the 2014 Lease, the sole agreement at issue in the case. On cross, Rothrock acknowledged that neither of the 2014 Lease contingencies were ever satisfied but claimed that he "ha[d] the ability to waive those contingencies." Tr. at 75:7–19. Counsel then asked whether such a waiver would need to be in writing and Rothrock testified that it would not. *Id*. at 75:22–24.

After re-cross, the court questioned Rothrock directly, in response to which he testified that "there was [sic] contingencies in the lease that were not fulfilled, but obviously I told you, you know, the language in the lease does not -- you know, if I personally waive them, it's still -- the lease is still valid." *Id*. at 92:18–22. The court then confronted Rothrock with language in the Agreement of Lease stating that, contrary to his testimony on cross, any such waiver would need to be in writing. *Id*. at 98:2–17. This language is as follows:

> No failure by Landlord to insist upon the strict performance of any agreement, term, covenant or condition hereof or to exercise any right or remedy upon a breach thereof, and no acceptance of full or partial Annual Minimum Rent, Additional Rent, or other charges or payment during the continuance of any such breach, shall constitute or be implied as a waiver of any such breach or of any such agreement, term, covenant or condition. No agreement, term, covenant or condition hereof to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each and every agreement, term, covenant and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

Agreement of Lease at § 24(G). The court asked Rothrock whether there had been any such written instrument here. Tr. at 98:12–17. Rothrock answered, "[n]ot to my knowledge." *Id*. at 98:18.

In post-trial briefing, Cedar Crest did not dispute that there had been no written waiver but tried to argue that section 24(G) did not actually require one:

> Obviously the first paragraph deals specifically and only with the *Landlord's* determination that it could waive any contingencies, clauses, terms or covenants in the Lease if the Landlord so chose. In that instance there is no requirement that the Landlord's unilateral waiver be in writing. This is consistent with David Rothrock's testimony at Trial.
>
> Conversely, the second paragraph deals with the failure of the *Tenant* to meet the contingencies and to thereby seek a waiver for modification of a term in the Lease. Essentially, if the *Tenant* wanted the Landlord to waive the condition and thereby went to the Landlord seeking such a waiver then the waiver would only become effective if in fact a writing was issued by the Landlord. Where the Landlord, as previously stated, does not seek to enforce a particular term or condition the *Landlord's* decision does not require that a writing be created.

Br. of Pl. in Supp. of Pl.'s Claims Against the Def. ("Pl.'s Br.") at 4, Doc. No. 77-1. Cedar Crest's interpretation depends on reading section 24(G) as two paragraphs, but section 24(G) is, in fact, only one paragraph.[6] There can therefore be no argument that the written waiver requirement somehow does not apply to the whole paragraph. Moreover, Cedar Crest's interpretation of the first sentence of Section 24(G) (what it characterizes as the first paragraph) is the exact opposite of what the sentence actually says. In contrast to Cedar Crest's interpretation, the sentence states that the Landlord's failure to insist upon strict performance cannot "constitute or be implied as a waiver" at all. Agreement of Lease § 24(G); *see also* Pl.'s Proposed Findings and Conclusions at p. 15, ¶ 24 ("The language of paragraph 24 G of the

---

[6] Cedar Crest's interpretation seems to come from the fact that the transcript split the court's recitation of section 24(G) into two paragraphs. Pl.'s Br. at 3 (citing transcript). Of course, in orally reciting section 24(G), the court in no way indicated one way or the other whether there should be a paragraph break in between the two sections. Regardless, what would control would be the Lease provision itself, not the precise way the court recited it.

subject Lease does not impute to the Landlord, Plaintiff herein, the requirement to insist upon strict performance of any term or covenant and the failure to so insist *did not act as a waiver of the breach of any term or covenant*." (emphasis added)). Rothrock's failure to insist that Bosselli satisfy either of the Lease contingencies, per the clear meaning of the contract, did not amount to a waiver of those conditions, and so the Lease was never validated.

Cedar Crest's assertion "that the Plaintiff had either unilaterally decided to waive the contingency, or agreed to the *Tenant's request that the contingency be waived*," Pl.'s Br. at 5 (emphasis added), further demonstrates the illogic of its position. Indeed, Cedar Crest's own interpretation of the 2014 Lease is that "if the *Tenant* wanted the Landlord to waive the condition and thereby went to the Landlord seeking such a waiver then the waiver would only become effective if in fact a writing was issued by the Landlord." *Id.* at 4. By Cedar Crest's own interpretation then, the "*Tenant's* request that the contingency be waived" is the precise scenario that requires a written waiver.

Likewise, the fact that no one mentioned this argument until post-trial briefing—even though the waiver of the contingency was very much at issue at trial—supports the court's view that this is an *ad hoc* interpretation meant to overcome the clear reality that the Lease never actually came into being. Cedar Crest argues, "[o]bviously, the actions of the Landlord by accepting the Lease and in fact executing the Lease and then ultimately taking the deposit check and attempting to place it into the operating account shows" that the contingency was waived, and the Lease became operative. *Id.* at 5. But the Lease explicitly provides only one mechanism to waive a lease contingency, and that mechanism is a written waiver, not an acceptance of the Lease or the deposit check. The first sentence of section 24(G) could not be more clear: the Landlord's failure to insist upon strict performance of any term, *i.e.*, by accepting the Lease of a

deposit check, "shall [not] constitute or be implied as a waiver of any such breach or of any such agreement, term, covenant or condition." Agreement of Lease § 24(G).[7]

## B. Whether D'Eletto Executed the Lease

Even if Cedar Crest had effectively waived the Lease contingencies, the court deems D'Eletto's testimony that he did not sign the agreement to be credible. D'Eletto testified that he had not been looking for any property in Pennsylvania until Schumacher approached him about potentially leasing the Cedar Crest property, telling him, "you know, Mr. Rothrock has quite a bit of money. Maybe if you take his building, maybe he'll get – be partners with you or you can help him with something." Tr. at 157:11–17. D'Eletto's response was that he "couldn't fathom taking a building, if [he] d[id]n't have any money to pay for it." *Id*. at 157:17–19. Schumacher then sent him a 2012 version of the lease over email, but he never read it "because why get into a contract agreement, if you don't have money?" *Id*. at 157:21–158:1. He further testified that the first time he saw the 2014 Lease was when he received notification of the default judgment, *id*. at 158:4–5, at which point he "flipped" and was "totally shocked." *Id*. at 158:14–16. He also testified that the signature on the lease was not his own. *Id*. at 158:19; 161:21–22. Cedar Crest presented no evidence that contradicted D'Eletto's credible testimony, and so the court agrees with Bosselli that it "never entered into the Ostensible Lease with Cedar Crest." Def.'s Proposed Findings and Conclusions at ¶ 12.[8]

---

[7] The court also is unclear about whether the contingencies listed in section L are the type of "agreement, term, covenant or condition" that can be waived at all. Arguably, if neither contingency was ever fulfilled, then the Lease—including the waiver provisions in section 24(G)—would not be valid. Rothrock told the court, "[i]f there's defaults [sic] under [the Lease], it's still a valid lease." Tr. at 92:24–25. But this is not an issue of a default; it is an issue of lease contingencies, on the fulfillment of which "[t]he validity of th[e] Lease [wa]s contingent." Agreement of Lease at § L. Regardless, the court need not resolve this issue, because there was no written waiver in any event.

[8] Cedar Crest asserts, "[t]he Defendant failed to provide expert evidence regarding the allegation or defense that the at-issue Lease was neither signed nor initialed by him since the Defendant failed to provide expert testimony calling into question his signature or initials which are affixed to the subject Lease." Pl.'s Proposed Findings and Conclusions at p. 14, ¶ 10. Expert testimony would have been one mechanism through which Bosselli could have challenged the signature's authenticity, but it certainly is not the only way.

## C. Whether D'Eletto Would be Bound by Schumacher's Acts Under an Apparent Agency Theory

Alternatively, Cedar Crest argues that, even if D'Eletto did not sign the Lease, Schumacher had apparent authority to do so on his behalf, and so Bosselli is nonetheless bound by his acts. In Pennsylvania,

> [a]pparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power.

*Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968) (citing *Jennings v. Pittsburgh Mercantile Co.*, 202 A.2d 51 (Pa. 1964); Restatement (Second) of Agency §§ 8, 27 (1958)). "The crucial question in ascertaining whether apparent authority has been created is whether the principal has made representations concerning the agent's authority to the third party." *Edwards v. Born, Inc.*, 792 F.2d 387, 390 (3d Cir. 1986) (citing *Amritt v. Paragon Homes, Inc.*, 474 F.2d 1251, 1252 (3d Cir. 1973); Restatement (Second) of Agency §§ 8, 27). Apparent authority exists only so far as "it is reasonable for the third party dealing with the agent to believe the agent is authorized." *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 345 (3d Cir. 2004) (quoting *D&G Equip. Co., Inc. v. First Nat'l Bank of Greencastle*, 764 F.2d 950, 954 (3d Cir. 1985)). Whether

---

Cedar Crest also argues that

the Defendant, as the former employer of David Schumacher and as the party utilizing the alleged acts of Mr. Schumacher as a defense for which the Defendant had the burden of proof, it is permissible for this Honorable Court to reach the inference that the failure of the Defendant to ultimately call David Schumacher provides the presumption that if Schumacher had testified it would not have been favorably towards the Defendant.

Pl.'s Proposed Findings and Conclusions at p. 15, ¶ 13. Cedar Crest cites to *Haas v. Kasnot*, 92 A.2d 171 (Pa. 1952), Pl.'s Proposed Findings and Conclusions at p. 15, ¶ 12, but in that case, the plaintiffs did not know the identity of the third party witness, and so the trial judge's instruction to the jury that the witness "'was equally available to both plaintiffs and the defendant'" was "obviously unfair to plaintiffs." 92 A.2d at 173 (internal quotation marks and citation omitted). Here, in contrast, either party could have secured Schumacher's testimony by subpoenaing him; his testimony was not evidence within Bosselli's control just because Cedar Crest alleges that Schumacher was a former Bosselli employee.

the third party's belief is reasonable depends on whether "a man of ordinary prudence, diligence and discretion would have a right to believe and would actually believe that the agent possessed the authority he purported to exercise." *Id.* (quoting *Universal Comput. Sys., Inc. v. Med. Servs. Ass'n of Pa.*, 628 F.2d 820, 823 (3d Cir. 1980)); *see also Sea-Land Serv., Inc. v. Landis*, No. Civ. A. 94-6153, 1995 WL 634452, at *4 (E.D. Pa. Oct. 27, 1995) ("[T]he issue is whether the transactions . . . were so out of the ordinary as to put the plaintiff on notice to inquire about limitations on [the purported agent's] authority."). Even if the purported agent had actual or apparent authority to execute one transaction, that authority would not necessarily extend to other transactions or other contexts. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("[A] principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority." (citing Restatement (Second) of Agency §§ 249, 262 (1957); *Rutherford v. Rideout Bank*, 11 Cal. 2d 479 (1938))); *Stout St. Funding LLC v. Johnson*, 873 F. Supp. 2d 632, 640 (E.D. Pa. 2012) ("Courts also may inquire into the scope of the principal-agent relationship to determine whether the agent acted with actual or apparent authority to close the transaction on behalf of the principal." (collecting cases)).

The court first notes that this does not appear to be a case of apparent authority at all. Indeed, the evidence presented established that Rothrock and Pascal did not believe—and in Rothrock's case, still do not believe—that Schumacher signed the Agreement of Lease on D'Eletto's behalf. Instead, they believed that D'Eletto had signed it himself, and so there was no question of authority. *See* Tr. at 133:23–134:1 ("David Schumacher never said to me I'm signing anything on behalf of Bosselli. He said he's taking these actually up you [sic] and that [D'Eletto] would be signing them."). If Schumacher affixed his own signature to the Agreement of Lease,

then the question for the court would be whether D'Eletto made representations to Cedar Crest's representatives suggesting that he had the authority to do so. But that is not what happened here. Instead, Schumacher—seemingly fraudulently—pretended to act as an intermediary between Cedar Crest and D'Eletto and seemingly forged D'Eletto's signature as part of his fraud. Certainly, there has been no evidence that D'Eletto participated in any way in the scheme. To the contrary, the court has already held that he testified credibly that he had no idea about the Lease or the significant negotiations behind it. Of course, no theory of liability supports holding D'Eletto's company responsible for a nearly $19 million debt where Rothrock accepted that it was his signature on the Agreement of Lease, without requiring the document to be notarized and after having not once spoken to D'Eletto about the agreement. Such a result would be entirely unjust. Thus, based on the evidence presented at trial, if Cedar Crest has a cause of action against anyone, it would be against Schumacher for fraud.

Even if that were not the case, the trial revealed no evidence that D'Eletto represented to Cedar Crest, either through Rothrock or Pascal, that Schumacher had the authority to bind Bosselli to such an agreement. Perplexingly, although Cedar Crest recognizes the correct legal standard in its proposed conclusions of law (*see* Pl.'s Proposed Findings and Conclusions at p. 14, ¶ 8 ("It is the actions of the principal and not the actions of the agent, that create apparent authority.")), it nonetheless seeks to establish apparent authority through the representations of Schumacher, the purported agent. *See* Pl.'s Proposed Findings and Conclusions at p. 1, ¶ 4 ("David Rothrock, managing member of Cedar Crest Professional Park VII LP had numerous discussions with Michael Pascal and David Schumacher regarding a potential lease by Bosselli Italy of commercial space at Cedar Crest Professional Park."); *id*. at p. 2, ¶ 5 ("During the numerous discussions David Schumacher indicated that he was the authorized agent for

Vincenzo D'Eletto, the managing member of Boselli [sic] Italy, LLC."); *id.* at p. 3, ¶ 10 ("At all times relevant during the discussions which led up to the presentation of the term loan 'Application Letter and Project Term Sheet', David Schumacher repeatedly indicated he had agency authority on behalf of Bosselli Italy, LLC and Vincenzo D'Eletto personally."); *id.* at pp. 4–5, ¶ 17 ("During various conversations between John Fugett and David Schumacher, Mr. Schumacher indicated that he was employed by Vincenzo D'Eletto/Bosselli Italia and that he specifically was engaged in making all business and investment decisions for Vincenzo D'Eletto and Bosselli Italia."). None of these statements are relevant to the question of what the purported principal, *i.e.*, D'Eletto, represented to Cedar Crest to make it believe that Schumacher was his agent.

Likewise, at trial, both Rothrock's and Pascal's testimony demonstrated that they believed Schumacher was Bosselli's agent because of Schumacher's own representations, not D'Eletto's. Counsel specifically asked Rothrock why he believed Schumacher was D'Eletto's agent, and he answered that Schumacher "had represented that to [him] on multiple occasions." Tr. at 81:14–16. Counsel then asked, "did [D'Eletto] ever represent prior to the lease signing that Mr. Schumacher was his agent?" *Id.* at 82:7–8. He answered, "[t]o me, no." *Id.* at 82:9. Pascal likewise provided an affidavit, the accuracy to which he attested at trial, stating, "[a]t all times since 2012, David Schumacher has advised me that he has agency authority from Vincenzo D'Eletto to execute documents and make business deals." *Id.* at 131:8–12 (referencing affidavit).

Aside from that testimony, Cedar Crest points to generalized statements from D'Eletto that occurred entirely outside the context of the Lease negotiations and, in some cases, to third parties unaffiliated with Cedar Crest or Rothrock. In other cases, Cedar Crest points to events

that occurred well after the Lease negotiations. The court discusses the inadequacy of each of these purported pieces of evidence in turn.

At trial, Pascal testified that during a phone call at some point before the 2012 lease negotiations, D'Eletto "referenced Mr. Schumacher as his brother and said [Pascal was] now his brother, because [he was] close to [Schumacher] and referred to [Schumacher] as his number two guy. In subsequent conversations, he said . . . [Schumacher was his] Vice President of construction and development." *Id*. at 111:8–12. In another conversation some unspecified amount of time later,

> [D'Eletto] said -- you know, and maybe -- not in regards to the lease, but just in conversation that [Schumacher wa]s his guy who[ was] going to handle his buildout in San Marino, [Italy,] who[ was] going to, you know, sort of just handle everything as far as his buildout of his stores and you know, help work on the leases in New York in the stores.

*Id*. at 111:13–24. He testified repeatedly to his understanding that Schumacher was working on "opening the stores." *Id*. at 112:24–113:7.

Pascal acknowledged that he never discussed either the 2012 lease nor the 2014 Lease with D'Eletto but testified that he had listened in on a telephone conversation between Schumacher and D'Eletto about financing Bosselli around the time of the Lease negotiations. *Id*. at 115:20–116:2. This is insufficient to establish apparent authority. First, D'Eletto could not have possibly "made representations" to Pascal during a conversation to which he had no idea that Pascal was listening. *See id*. at 117:2–4 ("Q: Did Mr. Schumacher announce or indicate to Mr. D'Eletto that he was speaker, and you were listening? A: No."). Second, the conversation made no reference to the Pennsylvania property, the Lease, or Schumacher's authority to act for Bosselli in any way. *See id*. at 118:9–14 (describing conversation as "basically just reaffirming what [Schumacher] told myself and Mr. Rothrock that the financing for Bosselli Italy will be

coming through, at that time . . . they would have the financing and be able to move forward on projects they were working on."); *see also id.* at 118:15–19 (stating that Pascal "d[id]n't believe there was" any discussion about 2014 Lease during the call). Counsel then asked Pascal whether he had ever spoken directly to D'Eletto or listened in on any conversations between Schumacher and D'Eletto about the Lease, to which he responded, "as it relates to the lease, no. It was in relation to financing of Bosselli Italy." *Id.* at 119:21–120:1.

These generalized statements—which, again, occurred exclusively in conversations in which no one mentioned the Lease—are insufficient to establish apparent authority to execute any agreement, let alone a nearly $19 million lease. Even accepting as true that D'Eletto told Pascal that he was close to Schumacher and that Schumacher was "handling" other ventures for him in entirely different locations, that would not lead a reasonable person to understand that Schumacher had unilateral authority to enter major transactions on Bosselli's behalf. If anything, it suggested that Schumacher would play a key role in the negotiations and would bring potential deals to D'Eletto so that he could then decide whether to pursue them further. Indeed, Pascal's testimony that D'Eletto referred to him as his "brother" immediately after meeting him suggests D'Eletto used such language broadly, and clearly without any intent to bestow some unbridled power on anyone. Indeed, Pascal even testified that he did not believe D'Eletto calling Schumacher his "brother" meant that he was his agent. *See id.* at 133:10–13 ("Q: If someone calls you their brother, in your mind, does that mean they have the right to sign a financial deal for you? A: I don't know. Everyone characterizes that as different [sic], so I can't determine that."). Cedar Crest also points to testimony about D'Eletto referring to Schumacher as his "asset manager," sending him to look at potential lease spaces in New York and expecting Schumacher to bring potential deals to him. Pl.'s Proposed Findings and Conclusions at p. 12, ¶¶ 56–58. If

anything, this suggests that D'Eletto instructed Schumacher to identify potential properties to then present to him so that he could decide whether to lease the property himself; it does not suggest Schumacher was authorized to enter such transactions entirely on his own without receiving any further input from D'Eletto. Even Cedar Crest characterizes Schumacher's power as "authority to act on behalf of Boselli [sic] Italy in order to find deals for Boselli [sic] Italy." *Id*. at p. 12, ¶ 58. The question here is not whether D'Eletto granted Schumacher authority to *find* deals; it is whether he granted him authority to *enter* them.

Beyond that testimony, Cedar Crest makes general assertions suggesting D'Eletto played a role in authorizing Schumacher to engage in lease negotiations, but an examination of the cited testimony supports no such assertion. Cedar Crest represents, "[p]rior to the Lease being fully executed and initialed there were ongoing negotiations between David Rothrock, David Schumacher and Michael Pascal *at the request of Vincenzo D'Eletto* leading up to D'Eletto obtaining his funding in order to operate his business." *Id.* at p. 7, ¶ 30 (emphasis added). The testimony Cedar Crest cites for this assertion again only reflects that Schumacher himself represented that D'Eletto had requested these discussions; the record is wholly devoid of any evidence that D'Eletto even knew about the Lease negotiations. *See* Tr. at 46:18–20 ("Q: Who made the representations that Vincenzo, Mr. D'Eletto, was still working on his financing? A: David Schumacher and Mike Pascal."); *id*. at 54:3–7 ("There was [sic] continued negotiations with Dave Schumacher and Mike Pascal to make some modification, as I was told by [Schumacher] that Mr. D'Eletto was nearing his -- getting his funding, and they wanted to make a couple of modifications to the lease and resign it.").

Cedar Crest also points to its ongoing discussions with D'Eletto regarding securing financing for Bosselli. Specifically, it cites to Rothrock's testimony that "during the preparation

of the aforesaid [financing document], Vincenzo D'Eletto verbally acknowledged that Schumacher was working with Rothrock towards the preparation of the exhibit." Pl.'s Proposed Findings and Conclusions at p. 9, ¶ 41. But the cited testimony only references the financing agreement and negotiations generally between Rothrock and Schumacher, without any discussion of D'Eletto's involvement. Tr. at 69:15–70:14. Indeed, the lines immediately following the cited testimony state that Rothrock only had "a cursory summary call . . . [in which D'Eletto] just acknowledged that we were moving forward on -- on this project." *Id*. at 70:17–71:1. Counsel specifically asked Rothrock about any representations D'Eletto made concerning the scope of Schumacher's purported agency, and he answered, "[f]rom my recollection he just acknowledged that [Schumacher] was working with me on it." *Id*. at 71:5–6. Such an interaction does not support the existence of agency authority at all, let alone authority to enter a lease that was not in any way discussed during these negotiations.

Cedar Crest tries to overcome the lack of evidence that D'Eletto bestowed Schumacher with authority by arguing that he in no way specified that Schumacher *did not* have authority to act on his and Bosselli's behalf. *See* Pl.'s Proposed Findings and Conclusions at p. 9, ¶ 42 ("David Rothrock testified that David Schumacher repeatedly indicated that he had agency authority on behalf of Boselli [sic] Italy, LLC and Vincenzo D'Eletto personally and that during a phone conversation with Vincenzo D'Eletto he did not in any way contradict the aforesaid."). But it presented no evidence that D'Eletto knew Schumacher was making such representations, and what possible reason would D'Eletto have to disclaim Schumacher's authority if he had no reason to believe anyone thought it existed in the first place? Likewise, Cedar Crest points to D'Eletto's testimony that he had received loans from Schumacher and had agreed that Schumacher would have a job with Bosselli as Vice President of Construction when the

company was financed, *id.* at p. 11, ¶¶ 49–51, but it does not explain how those facts are relevant to the agency analysis.

Cedar Crest also points to D'Eletto's testimony that Bosselli paid for a cellphone Schumacher used. *Id.* at p. 10, ¶ 47. But Pascal only learned that Schumacher had that cell phone after the Lease negotiations. Tr. at 132:6–133:3. And more importantly, a company providing a cell phone to an employee does not bestow authority on that employee to execute agreements on its behalf. Indeed, if that were the case, there would be countless relatively low-ranking employees who had the power to enter multi-million-dollar deals on their employer's behalf, simply because they participated in an employer-sponsored phone program. There is no basis in the law—or in common sense—to allow such a result.

Lastly, Cedar Crest points to testimony from another individual, unaffiliated with Cedar Crest, who engaged in communications with Schumacher and D'Eletto about an entirely separate deal. *See* Pl.'s Proposed Findings and Conclusions at p. 5, ¶ 23 ("Through the testimony of John Fugett it was determined that Vincenzo D'Eletto authorized David Schumacher to act as his business agent and/or the business agent for Boselli [sic] Italy."). Again, this statement relies primarily on Schumacher's own "numerous representations that he was working with Vincenzo D'Eletto on a day to day basis." *Id.* at p. 6, ¶ 24. But Cedar Crest also claims, "[t]he testimony of John Fugett confirmed that Vincenzo D'Eletto personally stated to [him] that he had a business and financial relationship with David Schumacher such that Schumacher had the authority to bind Boselli [sic] Italy and that Schumacher made decisions for Boselli [sic] Italy." *Id.* at p. 6, ¶ 26. Contrary to this characterization, most of the cited testimony reflects, in fact, Schumacher's own representations that he had such authority. *See* Tr. at 22:23–23:3 ("[Schumacher] was pretty clear in saying that he was Mr. D'Eletto's number two, for lack of a better word. He was

screening projects for Mr. D'Eletto, and worked very closely with him on a day-to-day basis."); *id.* at 23:19–24:7 ("[Schumacher] recommended – I mean, represented that he made these decisions and was working with Mr. D'Eletto on a day-to-day basis.").

The final piece of cited testimony relates to Cedar Crest's assertion that "[v]ia email, Mr. D'Eletto authorized David Schumacher to execute a loan agreement involving Bosselli Italia on his, D'Eletto's, behalf." Pl.'s Proposed Findings and Conclusions at p. 5, ¶ 19; *see also id.* at p. 12, ¶ 55 ("D'Eletto confirmed that he authorized Schumacher to sign the agreement with John Fugett and that the email which was attached to John Fugett's Affidavit was valid."). If anything, the fact that D'Eletto specifically authorized Schumacher to sign this particular agreement demonstrates the limits of Schumacher's authority. Indeed, if Schumacher had unilateral authority to enter agreements on Bosselli's behalf, as Cedar Crest suggests, D'Eletto would not have needed to specifically authorize him to sign this agreement at all. Equally fatal to Cedar Crest's position, there is no evidence that Rothrock or Pascal knew about this email during the Lease negotiations, and even if they had, those discussions would not have been representations that D'Eletto made to Cedar Crest. *See Edwards*, 792 F.2d at 391 ("We agree with appellants that the record is devoid of communications directly from the [purported principals] to [the party asserting apparent authority existed], much less representations that might have led [the party asserting apparent authority existed] to believe that [the purported agent] had the [purported principals'] permission to settle."). Moreover, Schumacher's activity surrounding the Lease would not fall within the scope of his apparent authority from this entirely unrelated deal with a separate party. *See Am. Soc'y of Mech. Eng'rs, Inc.*, 456 U.S. at 566 ("[A] principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts *within the scope of his apparent authority*." (emphasis added) (citations omitted)).

Moreover, the evidence presented does not suggest that either Rothrock or Pascal acted as "m[e]n of ordinary prudence, diligence and discretion" in believing Schumacher's representations that he had the right to act on Bosselli's behalf. *In re Mushroom Transp. Co., Inc.*, 382 F.3d at 345 (quotation marks and citation omitted). After the security deposit checks Schumacher provided bounced (apparently because the bank "could not find the account," Tr. at 60:4–6), Rothrock "was provided with a litany of excuses/explanations regarding the alleged attorneys in New York upon whose alleged operating account the bounced check was written." Pl.'s Proposed Findings and Conclusions at p. 7, ¶ 34. Specifically, Schumacher told him that an "Attorney Evans" had gone "rogue, had some family issues, absconded with the money, and not to worry, that Mr. D'Eletto was getting his financing, that the checks would be replaced." Tr. at 61:5–10.[9] Rothrock did not testify that the checks were ever, in fact, replaced.

A reasonable person would have responded to this "litany of excuses" by contacting the principal to determine whether Schumacher had authority to act, and if so, why the Lease did not seem to be moving forward. But neither Rothrock nor Pascal did that. Cedar Crest itself asserts that "[i]t was conclusively established that various defaults under the Lease occurred as the initial deposit check bounced and Boselli [sic] Italy never moved into or otherwise resided in the subject leased space pursuant to the fully executed Lease." Pl.'s Proposed Findings and Conclusions at p. 8, ¶ 38. But despite these highly suspicious facts, no one from Cedar Crest ever contacted D'Eletto about the Lease—about which, again, neither Rothrock nor Pascal had ever spoken to him.

---

[9] Cedar Crest asserts, "a substantial payment was made on behalf of Bosselli Italy, LLC out of an escrow account of an attorney in New York for purposes of first month['s] rent and security deposit. Ultimately this check was not honored by the bank from which it was drawn." Pl.'s Proposed Findings and Conclusions at p. 2, ¶ 6. Obviously, the fact that the check bounced means, contrary to Cedar Crest's assertion, no "substantial payment" was made.

Beyond the check bouncing and Bosselli never actually taking possession of the property, Pascal's testimony demonstrated that any reasonable individual would have doubted that Bosselli had the financing necessary to fulfill the Lease. Pl.'s Proposed Findings and Conclusions at p. 12, ¶ 61. Pascal testified that D'Eletto asked him for an $8,000 loan to get the company financed. Tr. at 124:6–11. D'Eletto had reported to Pascal that he needed the money "to go to Europe[ and] pay certain fees to get his funding released." *Id*. at 125:8–9. D'Eletto promised Pascal $300,000 for this $8,000 loan, but Pascal ultimately declined to extend it because he would not sign a loan note. *Id*. at 128:11–19. D'Eletto did not even have $8,000 to fly to Europe, and Pascal so doubted his ability to repay that meager loan that he would not provide the funds, despite D'Eletto's promise that he would realize profits 37.5 times greater than the loan amount. And yet he and Rothrock somehow believed that the company could fulfill a multi-million lease agreement.[10]

## IV.    CONCLUSIONS OF LAW

1.    The Lease specified that no Lease provision, including any contingencies, could be waived without a written waiver from the landlord. As Cedar Crest provided no written waiver and does not dispute that neither of the Lease contingencies occurred, the Lease never became valid.

2.    D'Eletto did not make any representations to Pascal, Rothrock, or any other relevant individual that would have led a person of ordinary prudence, diligence, and discretion to believe that Schumacher had the authority to enter a lease on his or Bosselli's behalf, and so no apparent authority existed over Schumacher's forging D'Eletto's signature on the Lease.

---

[10] D'Eletto also sought a loan from Fugett, but there is no evidence that either Rothrock or Pascal knew about those discussions. Pl.'s Proposed Findings and Conclusions at p. 12, ¶ 60.

3.     As the Lease never came into being, D'Eletto did not sign any agreement, and Schumacher did not have apparent authority to act on his or Bosselli's behalf, Bosselli is entitled to have the confessed judgment stricken and to have judgment entered in its favor.

The court will enter a separate order and judgment.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.